[Civ. No. 10718. Fourth Dist., Div. Two. Aug. 10, 1971.]

AMALIA URIBE, Petitioner, v.
ROBERT M. HOWIE, as Agricultural Commissioner, etc., Respondent;
WASHBURN & BELL et al., Interveners and Respondents;
THE PEOPLE, Intervener and Appellant.

## COUNSEL

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Robert H. O'Brien and Andrea Sheridan Ordin, Deputy Attorneys General, for Intervener and Appellant.

Ray T. Sullivan, Jr., County Counsel, Bruce M. Cook and Steven A. Broiles, Deputy County Counsel, for Respondent.

Reid, Babbage & Coil, John D. Babbage and William R. Bailey, Jr., for Interveners and Respondents.

No appearance for Petitioner.

## OPINION

**GARDNER, P. J.**—Petitioner Amalia Uribe filed a petition for writ of mandate on April 8, 1969, seeking to compel respondent Robert Howie, as Riverside County Agricultural Commissioner, to permit her to inspect and copy pest control operator reports in his possession.

An order to show cause why the mandate should not issue was issued and Jose Uribe was appointed guardian ad litem to prosecute the action for the minor petitioner.

Certain interested individuals and business (Washburn & Bell, et al.) were allowed to intervene, and thereafter filed a complaint in intervention for an order enjoining respondent Howie from disclosing any of the information contained in said reports. An order to show cause regarding a preliminary injunction was issued, and at the same time, interveners noticed a motion to strike the order to show cause why the peremptory writ of mandate should not issue.

Thereafter, the People of the State of California were allowed to intervene, joining petitioner in her claim, and filed their complaint in intervention.

Interveners' demurrer to the People's complaint was overruled.

Trial ensued, at the conclusion of which the court filed its notice of intended decision, which indicated denial of the petition, granting of the injunction preventing disclosure, and denial of the relief sought by the People. Thereafter on February 17, 1970, findings of fact, conclusions of law and judgment granting permanent injunction and denying peremptory

writ of mandamus were signed and filed. The People filed a timely notice of appeal on their behalf alone.

Petitioner, 19 years of age and a resident alien, has for nine years lived in the City of Coachella, California. She is a farm worker in the Coachella Valley, in Gilroy and in Yuba City.

In early 1968 and on one occasion in 1969, while petitioner was working in the vineyards of the Coachella Valley in Riverside County, she suffered from blurred vision, itchy eyes and nausea. This condition continued for about a month after she ceased work. When petitioner returned to work she again suffered from blurred vision and itchy eyes. During the time she worked in the Coachella Valley she heard other workers complain about powder that was used on the leaves and about itchy eyes and blurred vision. They also complained about excessive sweating, nausea and dizzness experienced while working. Also, petitioner's brother was injured while working in the fields. He had some red spots on his back like a rash. Her brother did not have the rash before he started working in the grapes in the Coachella valley. The rash bothers him a great deal; when he works in the fields, it gets worse.

A doctor did not come out to the field, and neither the foreman nor the grower of the field provided any medical assistance to the complaining workers. Petitioner once asked a foreman what the white powder on the leaves was; he said he did not know.

Petitioner is worried about eating fruit and vegetables which have been treated with pesticides. From what she has heard and read, she believes that DDT hurts the consumer and that it may cause cancer. After suffering injuries in the field and becoming concerned about the possibility of danger in the foods that she was eating, petitioner asked her attorney to go with her to see the records of the pesticides that are applied in the Coachella Valley.

On April 1, 1969, petitioner, accompanied by her attorney David S. Averbuck, appeared in respondent's office. Petitioner's attorney demanded that petitioner be allowed to inspect or copy reports submitted by commercial pest control applicators in Riverside County that were in respondent's custody. These reports specify the name of the pesticide operator, the location and owner of the field or fields to which pesticides are applied, the chemical or combination thereof used, the quantities and concentration of pesticides employed, the crop to which they are applied, the pests being treated for, and the date of application. Petitioner sought to inspect and copy all such reports from throughout the county filed after January 1, 1969. Respondent Howie did not allow petitioner to inspect the records.

Petitioner wishes to inspect these records because she wants to take a blood test. By means of blood tests, she could be examined to see if she had been hurt by exposure to pesticides. She learned that only by obtaining the records could a doctor complete the tests. The test she was referring to is the cholinesterase base line test. Further, petitioner wants to know what kind of pesticides are being used and the amount and place they are used in order to ascertain whether her family is being injured.

Respondent Howie offered to and did present to petitioner and her attorney a copy of an annual summary report prepared by his office from reports received from commercial applicators showing the total quantity of various pesticides used in Riverside County, and the type of crops and the total crop acreage upon which such pesticides were applied. However, such summary does not reveal the specific property treated, the nature of any particular application, the name of any pest control operator, or the name of the owner of any specific parcel of property treated. Such annual report is furnished by respondent to the state Department of Agriculture yearly and is open to public inspection in respondent's office.

Interveners are licensed commercial pest control operators. They, and other commercial pest control operators, prepare monthly pest control operator reports of their operations pursuant to Agricultural Code section 11733.[1] The reports are then submitted to respondent on forms labeled "Riverside County Spray Report."

As noted, the reports show the name of the commercial operator, the location and owner of the grove, vineyard or other crop being sprayed, the date of application, the number of trees or acres treated, the kind of trees being treated, pests being treated for, the type of pesticide, including combinations of one or more pesticides and strength used, the dosage of each pesticide material used, and the amount of each concentrated pesticide material used in each application.

Each of the interveners and other commercial operators has developed over a period of years equipment with special modifications for his own use, combinations of pesticide materials used, and specific dosage and strength variations in applications which are unique to the commercial operators, including each of the interveners, in conducting operations for various customers. They do not disclose the nature of their own individually designed operations, procedure or equipment to the general public or to other commercial operators at meetings or otherwise. The reports prepared

---

[1]Agricultural Code section 11401 et seq. provides for the licensing and regulation of the agricultural pest control business. Section 11733 prescribes the records to be kept by the registrant in each of the properties treated and provides that the information shall be furnished to the commissioner when and as required.

by interveners and by other commercial operators are private business records while in their possession and contain information which, if made available to each of the other interveners or their other commercial operator competitors, would provide information from which each could determine the kind of equipment being used, the combinations of materials used, and the dosages and strength of materials used by other commercial operators in their pest control operations on specific groves or crops for specific owners.

The information contained in the subject reports would permit applicators to closely approach the services supplied by others but it is not sufficient to allow competitors to duplicate one another's techniques. An operator would need to know the weather conditions, the projected future weather conditions, the soil conditions, the condition of the tree or crop to be sprayed, the color of the fruit to be sprayed and the intensity of the insect population in order to duplicate a competitor's operation. In addition, the competitor would need a good judgment of the population dynamics of the insects involved.

Moreover, even though pesticide applicators have developed equipment with special modifications, such equipment is generally open to public view when not in use.

Persons who intend to apply a chemical which has been declared an injurious material by the state Director of Agriculture must apply to respondent's office for a permit to use it. In 1968, there were approximately 13,000 such pesticide applications in Riverside County. Respondent's office follows up and investigates to see whether the permittee used the injurious material in a proper manner, either by actually observing the application or by studying the monthly pest control operator reports. His office was able to see about 40 percent of the 1968 applications, leaving 60 percent to be studied through the subject reports. Respondent indicated it was important to his office that these reports be accurate because the integrity of the reports was really the essence of over half of his pesticide control program. Respondent has absolute confidence in the integrity and the accuracy of the reports supplied to him by commercial operators, including interveners, but he would lack such confidence in the accuracy and integrity of the reports if they were made public. (It should be noted that respondent was unable to articulate why he would lose confidence in these reports should they lose their confidential nature.) Consequently, the reports received by respondent, under a pledge and long standing policy of confidentiality, are not made public.

The policy of confidentiality maintained by respondent's office is supported by a policy letter No. I-3, issued by the California state Director

of Agriculture, since the reports are obtained under a pledge of confidentiality. However, even though the policy of the State Department of Agriculture, as reflected in the policy letter, coincides with respondent's own policy, it does not compel respondent to maintain the subject reports in confidence.

In spite of respondent's policy of maintaining the reports' confidentiality, he has provided the information contained in the reports—but not the reports themselves—to certain people, such as insurance adjusters, physicians, beekeepers, and alfalfa growers.

The trial court found that there is public concern regarding the effect of pesticides on public health and the environment. In particular, there is a problem in California regarding organic phosphate poisoning. Organic phosphates are pesticides, generally considered hazardous materials that can result in injuries and death. The Department of Public Health received approximately 100 to 200 reports of organic phosphate poisoning to farm workers between 1967 and the trial of this action in 1969.

Organic phosphates inhibit enzymes vital to the transmission of nerve impulses. The effect upon the body will depend upon the nerve which is short-circuited. For example, if a nerve that supplies eye muscles is short-circuited, vision will be altered and weakness or headache may ensue.

A proper preventative medical program or monitoring program can be established to prevent serious illness in workers exposed to pesticides; however, sufficient data is essential in order to provide the necessary information to establish such a program. The program would be set up to monitor the levels of enzyme by blood test, known as the cholinesterase base line test. If a person were showing a lowering of his enzyme level, exposure to pesticides could be limited for the length of time required for him to rebuild his enzyme to the proper level. The purpose of such a program would be to make a recommendation to management that a particular worker be withdrawn from subsequent exposure.

In order to make the program work, it would be necessary to know the toxicity of the particular chemical, the dosage and the time to which individuals are exposed to the particular chemical, the date that a certain organic phosphate is applied, and location of the fields.

Thus, information contained in the subject reports would assist clinics and health officials in properly maintaining a cholinesterase monitoring program. Respondent has been authorized by interveners to release information from their reports for use in a cholinesterase monitoring program sponsored or approved by the Riverside County Health Department, but not to release the reports themselves.

The work of Dr. Robert van den Bosch, a professor of entomology at the University of California at Berkeley, is principally concerned with the control of agricultural pests through biological control, which consists of the utilization of biotic natural enemies, that is, parasites and predators that affect these pests. He is also involved with the development of integrated control programs: pest control combining biological and chemical methods, largely based on ecological considerations. Dr. van den Bosch's studies include analyzing the cause and effect of pesticides, including (1) the costs to the growers, (2) secondary outbreaks of other pests, (3) target pest resurgences, (4) drift causing problems in adjacent crops, and (5) environmental pollution.

The information required by Agricultural Code section 11733, which is the subject of this lawsuit, would aid Dr. van den Bosch in several ways. It would establish the pattern of insecticide use. When Dr. van den Bosch and his team are trying to analyze the impact or the secondary effects of a given insecticide, the ability to establish an area-wide pattern of its use and to correlate secondary problems that develop following that use would be very helpful. Also, the information would be helpful in studying the economics of pest control. The reports would greatly aid study of the effect that specific materials, combinations or practices have on the growers' costs. And, the information relating to the volume of use of certain kinds of insecticides is pertinent to area-wide problems of drift and environmental pollution. The information in the records would assist in the study of the effect of pesticides on the environment and in the study of economical and ecologically safe pest control within California. There are patterns of ecological disruption today due to pesticide use. One of the ways that society has to attack this is to analyze patterns of use and what evolves from these usages. The information from the subject records would be very useful in ascertaining the effect that various materials, combinations and practices are having on costs to the grower and environmental disruption. Finally, the information would have a relationship to the recommendations that the university makes to the growers. If it is established from this type of information that a chemical is engendering a costly pest pattern following its use, it is important to warn the growers against the use of this material.

Dr. van den Bosch does not have the information now on the scale that would be available through the subject records.

The summary of pesticide use which is made public by respondent Howie is not sufficient for these purposes.

As noted, the trial court denied petitioner's writ of mandate to compel disclosure of the records submitted by commercial applicators of agricul-

tural pesticides to the county agricultural commissioner pursuant to Agricultural Code section 11733.

The trial court found that disclosure of those records, although public records, had been exempted from disclosure by Government Code section 6254, in that they were trade secrets, records for law enforcement or licensing purposes, and crop reports. Further, the court found that respondent had justified nondisclosure of the records pursuant to Government Code section 6255, and specifically that the public interest served by not making the records public outweighs the public interest served by disclosure.

In this appeal, the People assert that while the trial court was correct in ruling that the pest control applicators reports were public records in the hands of respondent Howie, it committed error in denying the petition for a writ of mandate to compel disclosure of the reports because they do not constitute crop reports, are not used for licensing or law enforcement purposes, do not contain trade secrets (all within the meaning of Gov. Code, § 6254) and that further, the public interest served by disclosure of these reports outweighs that served by nondisclosure. (Gov. Code, § 6255.) Further, the People assert that if Government Code sections 6254 and 6255 bar public disclosure of the pest control operators' reports, the sections as applied are unconstitutional, as violative of the public right to information.

■ Initially, we note our agreement with the determination of the trial court that the pest control operators' reports in the hands of the county agricultural commissioner are public records within the meaning of the California Public Records Act. (Gov. Code, § 6250 et seq.) Government Code section 6252, subdivision (d), as it read at the time of trial, stated: " 'Public records' includes all papers . . . and other documents containing information relating to the conduct of the public's business . . . ." Thus, the inquiry centers on the question of whether the county spray reports fall within some exception to the general rule of Government Code section 6253, making all public records open to public inspection.

At the time of the trial in this proceeding, Government Code section 6254 read, in pertinent part: ". . . nothing in this chapter shall be construed to require disclosure of the records that are:

"
. . . . . . . . . . . . . . . . . . .

"(d) Trade secrets;

"(e) . . . crop reports, which are obtained in confidence from any person;

"(f) Records of complaints to or investigations conducted by, or records of intelligence information or security procedures of, the office of the

Attorney General and the Department of Justice, and any state or local police agency, . . . for correctional, law enforcement or licensing purposes;

"
. . . . . . . . . . . . . . . " . . . . .

"(k) Records the disclosure of which is exempted or prohibited pursuant to provisions of federal or state law, including, but not limited to, provisions of the Evidence Code relating to privilege.

"
. . . . . . . . . . . . . . . " . . . . .

"Nothing in this section is to be construed as preventing any agency from opening its records concerning the administration of the agency to public inspection, unless disclosure is otherwise prohibited by law."

Government Code section 6255 stated: "The agency shall justify withholding any record by demonstrating that the record in question is exempt under express provisions of this chapter or that on the facts of the particular case the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record."

Evidence Code section 1040 states in pertinent part:

"(a) As used in this section, 'official information' means information acquired in confidence by a public employee in the course of his duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made.

"(b) A public entity has a privilege to refuse to disclose official information, and to prevent another from disclosing such information, if the privilege is claimed by a person authorized by a public entity to do so and:

"
. . . . . . . . . . . . . . . " . . . . .

"(2) Disclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice; but no privilege may be claimed under this paragraph if any person authorized to do so has consented that the information be disclosed in the proceeding. In determining whether disclosure of the information is against the public interest, the interest of the public entity as a party in the outcome of the proceeding may not be considered."

Evidence Code section 1060 states: "If he or his agent or employee claims the privilege, the owner of a trade secret has a privilege to refuse to disclose the secret, and to prevent another from disclosing it, if the

allowance of the privilege will not tend to conceal fraud or otherwise work injustice."

As noted, the trial court denied disclosure of the spray reports, basing its ruling on four separate grounds: (1) the reports contain trade secrets within the meaning of then Government Code section 6254, subdivision (d) and Evidence Code section 1060, as incorporated into the Government Code by section 6254, subdivision (k); (2) the reports constituted crop reports within the meaning of Government Code section 6254, subdivision (e); (3) they were reports of a local agency compiled for correctional, law enforcement or licensing purposes (Gov. Code, § 6254, subd. (f)); (4) the public interest served by nondisclosure of the reports outweighed that served by disclosure. We must review these determinations individually.

## I.

### TRADE SECRETS

As noted above, at the time of trial of this case, trade secrets were exempt from the requirement that public records be open for inspection by two provisions of Government Code section 6254. They were specifically exempted by subdivision (d), and by reference through subdivision (k) which incorporated the terms of Evidence Code section 1060. Then subdivision (d) appeared to grant a per se exemption to public inspection for all material containing trade secrets, while Evidence Code section 1060 grants such exemption only if "allowance of the privilege will not tend to conceal fraud or otherwise work injustice." Thus, a balancing of interests is necessary to determine whether the exemption will be allowed under Evidence Code section 1060. (See code commissioner's notes following Evid. Code, § 1060.) Strong policy considerations militate in favor of interpreting subdivision (d) in a similar manner, as providing for a balancing of interests. An absolute privilege for all trade secrets could amount to a legally sanctioned license for unfair competition or fraud and enable the continued use of dangerous materials by a party asserting the privilege. The final paragraph of section 6254 makes clear the exemptions contained in that section are not absolute. This interpretation is strengthened by the fact that in 1970, the Legislature amended subdivision (d) so as to repeal the trade secret exemption created therein; as currently constituted, Government Code section 6254 grants exemption from disclosure to public records containing trade secrets only under the provisions of subdivision (k) as that incorporates the provisions of Evidence Code section 1060. Thus, we find that, as it read from the time of its enactment in 1968 to its amendment in 1970, subdivision (d) of Government Code section 6254, allowed

nondisclosure of public records containing trade secrets only when to do so would not tend to conceal fraud or otherwise work injustice. The protection thus afforded trade secrets by subdivisions (d) and (k) between 1968 and 1970 was identical; in each case, the trade secret might be protected only if the interests of justice are thus best served. (See *Terzian* v. *Superior Court,* 10 Cal.App.3d 286, 294 [88 Cal.Rptr. 806].)

■ Initially, we would note that in determining whether the pesticide spray reports here in issue contain trade secrets, we are not bound by the determination made by the trial court. What constitutes a trade secret is a question of law, not the finding of fact respondents seem to suggest it is. (*Futurecraft Corp.* v. *Clary Corp.,* 205 Cal.App.2d 279 [23 Cal.Rptr. 198]; *By-Buk Co.* v. *Printed Cellophane Tape Co.,* 163 Cal.App.2d 157, 166 [329 P.2d 147].)

Restatement, Torts, volume 4, section 757, comment b, page 5, states: "b. *Definition of trade secret.* A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information in a business (see § 759) in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.

"*Secrecy.* The subject matter of a trade secret must be secret. Matters of public kowledge or of general knowledge in an industry cannot be appropriated by one as his secret. . . . Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process

or formula by independent invention and are keeping it a secret. Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

■ The Restatement definition of a trade secret has been adopted by the courts of this state. (*Diodes, Inc.* v. *Franzen,* 260 Cal.App.2d 244, 251 [67 Cal.Rptr. 19]; *Futurecraft Corp.* v. *Clary Corp., supra,* 205 Cal.App.2d 279, 288-289; *By-Buk Co.* v. *Printed Cellophane Tape Co., supra,* 163 Cal.App.2d 157, 166; see also *Winston Research Corp.* v. *Minnesota Min. & Mfg. Co.,* 350 F.2d 134, 145; *Sarkes Tarzian, Inc.* v. *Audio Devices, Inc.,* 166 F.Supp. 250, 257-259; *Sperry Rand Corporation* v. *Rothlein,* 241 F.Supp. 549, 560-561.)

A similar definition is given in Government Code section 6254.7, relating to the status as public records of air pollution data. While not controlling because applicable only to that section, and by its terms not meant to be a limiting definition, it is useful in formulating a concept of what the Legislature intended to protect in subdivision (d) of section 6254. " 'Trade Secrets,' . . . may include, but are not limited to, any formula, plan, pattern, process, tool, mechanism, compound, procedure, production data, or compilation of information which is not patented, which is known only to certain individuals within a commercial concern who are using it to fabricate, produce, or compound an article of trade or a service having commercial value, and which gives its user an opportunity to obtain a business advantage over competitors who do not know or use it."

■ Applying the above definitions, we find that the material contained in the pest control spray reports does not constitute trade secrets. The reports contain information stating the chemical composition of the pesticide spray, the quantity of the compound, the field to which the compound applied, the type of crop, the pest sprayed for, and the date of application. The first two items would perhaps fit within the general definition of a trade secret. The pest control applicators use their personal compounds of various types of prepared pesticides, and apply the compounds in various intensities. However, it is doubtful that this constitutes a process or device

for continuous use in the operation of the business. Government Code section 6254.7's definition, significantly, is couched in the present tense: "who are using," and "which gives." The reports at issue here reveal only a past decision, based on transitory conditions, as to the mixture and quantity of pesticide to be used. It appears from the evidence that various compounds in various intensities would be used to combat a given pest, depending upon the weather conditions, present and future, the condition of the crop to be sprayed and the soil upon which it is growing, and intensity of the insect population. Since the nature of the compound and the intensity of its application are being varied on the basis of these other factors, the mixture and dosage elements cannot be said to have the continuity of use envisioned by the Restatement definition.

Access to the reports would permit competitors to determine the kind of equipment which was used from among the general types of commercially available equipment, but there was no evidence the applicator's individual modifications could be discovered from the reports. And only these modifications could even arguably be considered trade secrets.

On balance, the six factors listed by the Restatement further indicate that the material contained in the spray reports are not trade secrets. The information contained in the reports is available to some individuals outside the pesticide application business: doctors, insurance adjusters, growers, etc., who, in the opinion of respondent Howie, have a need to know the information contained therein. Further, the evidence indicated that it was the practice of the pesticide applicators to specify the types and quantities of pesticide applied on their bills to the growers. Since the growers know the size of the land on which the application is made, they are in a position to calculate both the composition of the pesticide mix used and the strength of the application—the two factors of information the applicators are least anxious to have disclosed. And the equipment used to apply the pesticides is open to public view. Thus, while the information contained in the spray reports is not readily accessible to the general public, it may be procured by a number of people outside the pesticide application industry.

The applicators contend that the information contained in the reports is of considerable value to them. However, there was no evidence presented to indicate that the applicators had invested any great amount of time, money, or expertise above and beyond that common to the industry to develop the pesticide mixes and the dosage levels. From the nature of the processes involved, it seems more probable that the compounds and dosage levels were developed on an *ad hoc* basis, through trial and error. Thus, there would not seem to be any substantial investment in research and development to be protected by a policy of nondisclosure.

It does not appear from the evidence with what degree of ease or difficulty the compound formulae and dosage level techniques might be duplicated by others. It should be noted that the compounds are synthesized from commercial pesticides available to many. And if the techniques were evolved on a trial and error basis, they would not appear overly difficult to duplicate.

The materials used and the services performed in the analogous area of termite control work do not constitute trade secrets. (*Fortna* v. *Martin,* 158 Cal.App.2d 634, 639-640 [323 P.2d 146].) ▇▇ Alternatively, even if the information in the spray reports does contain trade secrets, we believe that the public interest is far better served by disclosure than by the converse. The public interest served by nondisclosure which the trial court found paramount was the effectiveness of the Commissioner's pesticide control program. Because he would lack confidence in the reports if the applicators knew they would be made public, he would not require reports to be filed with his office in the future. This would unquestionably weaken his control program. However, the weight of this consideration is lessened by the fact the Commissioner did not articulate the reasons he would lack confidence in the reports, expressly denying any expectation the applicators would falsify or withhold information. If there were no falsification or withholding of information, the control program could be continued in its present form without impairing its effectiveness.

Against this must be measured the interest of the public in having access to the contents of the spray reports. There was testimony presented that the information contained in the reports is important to the study of the effect of pesticides on man. The information would be useful to study the long range effects of pesticides on humans, and in the treatment of present illnesses traceable in whole or part to exposure to these chemicals.

Moreover, uncontradicted evidence is to the effect that the information in the reports would be most helpful to entomologists attempting to devise even more effective pesticide programs. The perfection of such programs would be of commercial benefit to the growers, who would be able to increase productivity and to the consumer, who would be able to obtain produce at reduced prices. These considerations far outweigh the interests of the pesticide spray applicators in barring inspection of the spray reports by the public. Further, we would note that if public disclosure of the spray reports is compelled, one applicator will not be able to gain a competitive advantage over his fellows. The reports of all applicators will be open to inspection, and each applicator may inspect the methods of the other. If anything, this interchange of ideas might improve the level of proficiency in the industry.

The California Department of Agriculture on May 14, 1971, adopted

an emergency regulation specifying time intervals in which farm workers may not be allowed to enter fields after pesticide spraying. The regulation, title 3, section 2475 of the California Administrative Code, is applicable to citrus, grape, peach and nectarine crops; it lists pesticides and the interval in days required after an application to each crop. It further provides that when a mixture of two or more organic phosphate pesticides is applied, the interval shall be prolonged by adding to the longest applicable interval an additional 50 percent of that interval. All pesticides listed must contain, on their labels or in supplementary printed directions distributed with them, this worker safety information. (Admin. Code, tit. 3, § 2403.) The adequacy and appropriateness of these new regulations, e.g., the length of the interval for each agent and the crops to which the regulation applies, are subjects of significant public interest. The spray reports at issue here would be a valuable source of data for members of the public who wish to comment on the regulations. And the reports, if the Commissioner continues to require them filed with his office, could be a significant aid to self-enforcement by farm workers of the waiting time regulation.

The Commissioner testified that if the court compelled disclosure of the spray reports, he would henceforth require the applicators to keep the reports in their offices, where he would inspect them in their custody. Under this system, the public would be denied access to the information contained in the reports, and the task of the county agriculture commissioner's office would be made more onerous. Under the provisions of the Agricultural Code as now constituted, i.e., section 12005, respondent Howie cannot be compelled to force the pesticide applicators to file spray reports with his office; respondent is legally free to initiate such a program, assuming he can do so consistent with the discharge of the obligations of his position. However, we have concluded that the public interest is best served by requiring disclosure of the spray reports currently on hand and such reports as respondent Howie may require filed hereafter.

## II.

### CROP REPORTS

The trial court ruled that the pesticide spray reports were crop reports within the meaning of Government Code section 6254, subdivision (e), and hence again exempt from the disclosure provisions of California Public Records Act. Appellant argues that this determination is erroneous as a matter of law. The People suggest that by crop reports, the Legislature intended to exempt from disclosure the reports filed under the provisions of the California Marketing Act of 1937, division 21, part 2, chapter 1, Agricultural

Code section 58601 et seq., and the Agricultural Producers Marketing Law, division 21, part 2, chapter 2, Agricultural Code section 59501 et seq.

■ We need not pass upon appellant's contention in this regard. For we are of the opinion that crop reports within the meaning of Government Code section 6254, subdivision (e) refer only to reports specifying the nature, extent, type or magnitude of crops being grown. The statute does not define the term, but the purpose of the exemption would seem to be to protect the financial confidentiality of growers' enterprises. The standardized pricing that exists in the commodity markets permits estimating, fairly accurately, a growers' income from knowledge of the quantity of a commodity he will or has harvested. And making such records public might interfere with trading in futures on commodity markets. ■ The spray applicators' reports here in question do list the type of crop to which the pesticide was applied. However, they do not yield information concerning the magnitude of that crop, its state of preparation, or its likely marketing date. They contain no financial data; no indication of the probable price of the harvested crop, and no indication of the price paid for the pesticide spraying service. They can neither affect the privacy of either the growers' or applicators' financial dealings, nor affect prices in commodity markets. Thus, we do not feel that these reports contain the type of information to which the Legislature wished to extend a disclosure exemption.

### III.

#### REPORTS COMPILED FOR LICENSING PURPOSES

The trial court ruled that the pesticide spray reports had been compiled for correctional law enforcement or licensing purposes within the meaning of Government Code section 6254, subdivision (f). The parties have not cited to us, and we have been unable to find any California authority defining the scope of the exemption created by this subsection. ■ However, the Federal Information Act (5 U.S.C.A. § 552) has an exemption similar to the one contained in Government Code section 6254, subdivision (f). The federal statute, in pertinent part, reads as follows: "(b) This section does not apply to matters that are —

" . . . . . . . . . . . . . . . . . .

"(7) investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency; . . ."

This section has been interpreted to apply only when the prospect of enforcement proceedings is concrete and definite. (*Bristol-Myers Company* v. *F.T.C.*, 424 F.2d 935, 939.) It is not enough that an agency label its

file "investigatory" and suggest that enforcement proceedings may be initiated at some unspecified future date or were previously considered. (*Bristol-Myers Company* v. *F.T.C., supra; Cooney* v. *Sun Shipbuilding & Drydock Company,* 288 F.Supp. 708, 711-712.)

We adopt the definition propounded by the federal courts. In their course of activities the regulatory agencies of this state accumulate numerous records which may, under certain circumstances, be used in disciplinary proceedings. Virtually any record so kept could be put to such use. To say that the exemption created by subdivision (f) is applicable to any document which a public agency might, under any circumstances, use in the course of a disciplinary proceeding would be to create a virtual *carte blanche* for the denial of public access to public records. The exception would thus swallow the rule. This could not have been the intent of the Legislature.

In the instant case, pesticide applicator spray reports had been used to review the licenses of the applicators on various occasions. However, this was not the primary purpose they were compiled. Nor was there any testimony that any of the reports were being put to such a purpose at the time of trial. If some reports were currently being used to investigate an applicator, the reports relating to that applicator would be exempt, but not all the reports. Thus, we conclude that the spray reports here in question were not compiled for a correctional law enforcement or licensing purpose within the meaning of Government Code section 6254, subdivision (f).

### IV.

#### PUBLIC INTEREST SERVED BY DISCLOSURE

The trial court ruled that on balance, public interest is better served by granting the spray reports exemption from public inspection than by opening them to the public in general. The court concluded that the reports were thereby exempted from disclosure under the provisions of Government Code section 6255. We have already discussed the public interests served by disclosure and nondisclosure at considerable length and have concluded that disclosure best serves the public interest. There is no need to repeat that discussion here. Suffice to say that we have concluded that the pesticide applicator spray reports are not exempt from public disclosure under the provisions of Government Code section 6255.[2]

---

[2]At trial, respondent Howie asserted that the spray reports were exempt from disclosure under the provisions of Evidence Code section 1040, as incorporated by Government Code section 6254, subdivision (k). Evidence Code section 1040 states in pertinent part: "(a) As used in this section, 'official information' means information acquired in confidence by a public employee in the course of his duty and not

Thus, in summary, we conclude that the trial court erred in denying appellant's petition for a writ of mandate and in granting respondents' petition for permanent injunction. We find that the pesticide applicators' spray reports are not exempted from public disclosure under any of the applicable sections of Government Code sections 6254 or 6255.

In light of our conclusions in this regard, it is unnecessary to pass upon appellant's contentions concerning any constitutionally guaranteed right to access to these reports.

The orders of the trial court are reversed and the cause remanded for further considerations consistent with this opinion.

Gabbert, J., and Tamura, J., concurred.

The petition of respondents Howie and Washburn & Bell for a hearing by the Supreme Court was denied October 6, 1971.

---

open, or officially disclosed, to the public prior to the time the claim of privilege is made.

"(b) A public entity has a privilege to refuse to disclose official information, and to prevent another from disclosing such information, if the privilege is by a person authorized by the public entity to do so and:

". . . . . . . . . . .

"(2) Disclosure of the information is against the public interest. . . ."

In light of our discussion relative to the claim of exemption under the trade secrets provision, we find that the spray reports are not exempted from disclosure by the provisions of Evidence Code section 1040: Disclosure is not against the public interest.