[No. G030680. Fourth Dist., Div. Three. Dec. 9, 2002.]

TONY RACKAUCKAS, as District Attorney, etc., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
LOS ANGELES TIMES COMMUNICATIONS, Real Party in Interest.

**COUNSEL**

Benjamin P. de Mayo, County Counsel, Marianne Van Riper, Nicole A. Sims and Amy E. Morgan, Deputy County Counsel, for Petitioner.

No appearance for Respondent.

Davis Wright Tremaine, Kelli L. Sager, Alonzo Wickers IV, Jean-Paul Jassy; and Karlene Goller for Real Party in Interest.

**OPINION**

**O'LEARY, J.**—We decline to rewrite the California Public Records Act (CPRA) (Gov. Code, § 6250 et seq.)[1] to require the public dissemination of a postinvestigative closing report that contains the investigators' opinions, thoughts and conclusions regarding potential criminal misconduct.

I

In September 2000, as a result of two separate incidents of alleged police misconduct involving Officer Edmund Kennedy, the Huntington Beach Police Department requested that the Orange County District Attorney initiate an investigation. This could result in the filing of criminal charges "if appropriate."

Ebrahim Baytieh, a deputy district attorney, conducted the investigation at the direction of Douglas Woodsmall, the supervisor of the Special

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

Assignments Unit of the Bureau of Investigation. On July 19, 2001, Baytieh wrote a public letter to the Huntington Beach Police Department stating that "we are of the opinion that there is a lack of sufficient evidence to support a filing of criminal charges against Officer Kennedy . . . . [¶] Our decision is mainly based on the fact that we lack sufficient evidence to prove beyond a reasonable doubt that Officer Kennedy engaged in any criminal conduct." In the absence of a criminal filing, Baytieh concluded that "the Office of the District Attorney is closing its inquiry into the matter." The district attorney formally closed its inquiry on July 30, 2001.

In August 2001, the Los Angeles Times (Times) e-mailed a CPRA request for all letters sent by the district attorney to the Huntington Beach Police Department regarding Officer Kennedy. Woodsmall produced the public letter from Baytieh, but asserted various CPRA exemptions to any other material in the investigative file, including the investigatory file privilege in section 6254, subdivision (f), as well as attorney work product, confidentiality and privacy. In January 2002, the Times narrowed its request to postinvestigation letters, but the district attorney still declined.

In March 2002, the Times filed a petition for writ of mandate to compel the district attorney to disclose "copies of all records generated by [the district attorney] regarding Officer Kennedy on or after July 19, 2001, i.e., after [the district attorney's] investigation of Officer Kennedy's alleged misconduct was complete . . . ."

In response to the trial court's query, the district attorney identified a nonpublic letter, also written on July 19, 2001, which was "arguably" covered by the Times' CPRA request. That letter was "generated" by the district attorney, dated July 19, 2001, and sent to the Huntington Beach Police Department in confidence.

The district attorney claimed that this nonpublic letter was exempt from disclosure under section 6254, subdivision (f) as part of its investigative file. The district attorney usually prepares a closing report to the presenting police agency regarding its conclusions "[w]hen we have completed our review of police misconduct cases. . . ." Baytieh declared that he prepared the nonpublic letter "as part of" the investigation and that it contained "my legal opinions, thoughts, impressions and conclusions. That document is part of the District Attorney's investigatory file regarding Officer Kennedy."

Woodsmall declared that disclosure of the nonpublic letter would have a "chilling effect" on future police misconduct investigations.[2]

A hearing was held on May 3, 2002. Neither side requested an in camera inspection. On May 14, 2002, the court issued a writ of mandate directing the district attorney to release to the Times "complete and unredacted copies of all records generated on or after July 19, 2001 by you regarding Huntington Beach Police Officer Ed Kennedy."

The district attorney sought extraordinary relief from this court. In June 2002, we issued an alternative writ of mandate directing the court to set aside its order or to show cause why a peremptory writ should not issue. The trial court has declined to set aside its order, and has awarded the Times $11,000 in attorney fees.

II

Because open governments are a hallmark of a democratic society, the public should have full access to information concerning the working of the government " 'in order to verify accountability.' " (*California State University, Fresno Assn., Inc. v. Superior Court* (2001) 90 Cal.App.4th 810, 823 [108 Cal.Rptr.2d 870].) The CPRA was enacted for this very purpose. (*Filarsky v. Superior Court* (2002) 28 Cal.4th 419, 425-426 [121 Cal.Rptr.2d 844, 49 P.3d 194].)

This, however, is not the be-all and end-all of our analysis. Also important is the right to privacy of people named in government records. (§ 6250 [declaring that the Legislature, in enacting the CPRA, is "mindful of the right of individuals to privacy"]; see *City of San Jose v. Superior Court* (1999) 74 Cal.App.4th 1008, 1017 [88 Cal.Rptr.2d 552] [barring newspaper's CPRA request for disclosure of names of individuals who complained to city about airport noise].) There additionally is a strong government interest in preventing and prosecuting criminal activity, whether street crime, white-collar crime or governmental corruption. (*Haynie v. Superior Court* (2001) 26 Cal.4th 1061, 1064 [112 Cal.Rptr.2d 80, 31 P.3d 760] [recognizing certain CPRA exemptions "for reasons of privacy, safety, and efficient governmental operation"].) We review de novo the trial court's ruling, but

---

[2]The Times asserts that this nonpublic letter was "post-investigation correspondence," which was written "[l]ater that same day, July 19." There is no support in the record for this characterization. As the district attorney points out, we have no way of knowing which letter was drafted first, and the investigation was not *formally* closed until July 30, weeks later.

defer to its determination of any express or implied factual findings. (*California First Amendment Coalition v. Superior Court* (1998) 67 Cal.App.4th 159, 173 [78 Cal.Rptr.2d 847].)

■ We are here concerned with the "broad" investigation exemption in section 6254, subdivision (f). (*Williams v. Superior Court* (1993) 5 Cal.4th 337, 349 [19 Cal.Rptr.2d 882, 852 P.2d 377].) It authorizes public agencies to withhold "[r]ecords of complaints to, or investigations conducted by, or records of intelligence information or security procedures of, the office of the Attorney General and the Department of Justice, and any state or local police agency, or any investigatory or security files compiled by any other state or local police agency, or any investigatory or security files compiled by any other state or local agency for correctional, law enforcement, or licensing purposes . . . ." (§ 6254, subd. (f).) Subdivision (f) further provides that "nothing in this division shall require the disclosure of that portion of those investigative files that reflect the analysis or conclusion of the investigating officer." Unlike its federal analog, the CPRA does not require agency justification of the need for secrecy on a case-by-case basis. (*Williams v. Superior Court, supra,* 5 Cal.4th at p. 353.)[3]

The investigation exemption does not terminate when the investigation terminates. (*Williams v. Superior Court, supra,* 5 Cal.4th at pp. 354-355.) In *Williams,* a newspaper waited until after the completion of a criminal prosecution before requesting copies of criminal investigatory records concerning the conduct of sheriff's deputies during a drug raid. Although there were no pending criminal proceedings, the Supreme Court held that the section 6254, subdivision (f) exemption "does not terminate with the conclusion of the investigation. Once an investigation . . . has come into being because there is a concrete and definite prospect of enforcement proceedings at that time, materials that relate to the investigation and, thus, properly belong in the file, remain exempt subject to the terms of the statute." (*Williams,* at pp. 361-362.)

In *Rivero v. Superior Court* (1997) 54 Cal.App.4th 1048 [63 Cal.Rptr.2d 213], the San Francisco District Attorney investigated a local official for misuse of public funds, but decided not to prosecute and closed its files. A year later, one of the people who initiated the investigation filed a CPRA request for the closed files. Citing the investigation exemption, *Rivero* refused to require disclosure, even though there was no showing of any

---

[3]Subdivision (f) does require disclosure of certain information derived from the arrest and other investigative records, but not the records themselves. (§ 6254, subd. (f)(2).)

adverse impact upon witness cooperation or evidence destruction. The requester in *Rivero* raised the same policy arguments as does the Times regarding a sanitized investigation, a governmental cover-up, and the need for the public to understand why government officials escaped legal sanction. The court was unpersuaded: "We observe . . . that the Legislature has amended section 6254 more than once . . . but has not revised the statute to permit disclosure of closed investigation files. We will not do what the Legislature has declined to do." (*Id.* at p. 1059.)

*Rivero* further noted that publicity-shy witnesses could be reluctant to come forward if they knew that sensitive information they provided potentially could be turned over. "Every effort must be made to ensure that investigators can gather all evidence that is available and legally obtainable." (*Rivero v. Superior Court, supra,* 54 Cal.App.4th at p. 1058.)

Recently, in *Haynie v. Superior Court, supra,* 26 Cal.4th 1061, the California Supreme Court rejected an attempt to further limit the investigation exemption. *Haynie* involved a CPRA request for citizen reports and police radio calls following a "routine" police stop of an African-American motorist based on mere suspicion of criminal conduct. (The neighbor's call that prompted the stop did not necessarily describe a crime, and no arrests were made, although the motorist was handcuffed and briefly detained.) (*Id.* at p. 1065.) Like the Times, the requester in *Haynie* argued that there was no danger of disclosing the identity of confidential informants, threatening the safety of police agents, victims, or witnesses, or revealing investigative techniques. Despite this, the Supreme Court applied the investigation exemption: "Limiting the section 6254(f) exemption only to records of investigations where the likelihood of enforcement has ripened into something concrete and definite would expose to the public the very sensitive investigative stages of determining whether a crime has been committed or who has committed it." (*Id.* at p. 1070.)

The Times attempts to distinguish *Williams, Rivero* and *Haynie* by characterizing the undisclosed July 19 letter as a *post*investigation record, presumably prepared after the district attorney decided not to prosecute. In contrast, the Times argues, the records in *Williams, Rivero* and *Haynie* were each prepared while the investigation was ongoing: "[W]hile Section 6254(f) may exempt investigation records created early in an inquiry before law enforcement authorities can possibly know whether there is a concrete and definite prospect of law enforcement proceedings, it does not exempt documents that are created after the conclusion of an inquiry when authorities expressly have ruled out any prospect of enforcement proceedings."

We follow the plain language of the statute, which contains no such distinction. (*Williams v. Superior Court, supra,* 5 Cal.4th at p. 350 ["Clearly the Legislature was capable of articulating additional limitations if that is what it had intended to do."].) As the Woodsmall and Baytieh declarations establish, the undisclosed letter directly relates to a "definite and concrete" investigation of Officer Kennedy, and is exempt from disclosure on its face. (*Williams v. Superior Court, supra,* 5 Cal.4th at p. 362.) Baytieh, its author, stated that he prepared the letter as part of the investigation to convey his "legal opinions, thoughts, impressions and conclusions." Both he and Woodsmall had personal knowledge of the matters stated in their declaration, and their remarks were not conclusory.[4]

*Uribe v. Howie* (1971) 19 Cal.App.3d 194 [96 Cal.Rptr. 493] is not applicable. In *Uribe,* a public agency sought to prevent disclosure of mandatory farm reports regarding pesticide use by inserting them into an investigatory file. *Uribe* refused to sanction such a subterfuge. Here, in contrast, the undisclosed letter had no purpose other than to report Baytieh's thoughts, opinions and conclusions. It properly (and exclusively) related to the investigation and legitimately belonged in the investigatory file. What other use could it serve? It remains exempt subject to the terms of the CPRA. If the Times wishes to redraft the language of the exemption, it should direct its efforts to the Legislature, not the judiciary.[5]

Public policy supports our conclusions. Police investigations contain a vast amount of raw or half-baked data, gleaned from witnesses of varying degrees of reliability, veracity and bias. Much of it is hard to digest, and could prove ruinous to personal reputations, careers, or relationships if released to the general public in unvarnished form. (See, e.g., *Daily Journal Corp. v. Superior Court* (1999) 20 Cal.4th 1117, 1132 [86 Cal.Rptr.2d 623, 979 P.2d 982] ["In the absence of an indictment, without the protections of the court process, the innocently accused and even witnesses are more vulnerable to a risk of adverse consequences ranging from reputational injury to retaliation."].)

One would hope that the investigators would feel free to candidly comment and communicate upon what they have learned through the inves-

---

[4]It would be self-defeating, as the Times suggests, to apply the secondary evidence rule (Evid. Code, § 1523, subd. (a)) to require the production of the letter since that is what the litigation is all about.

[5]We doubt, for example, that the Times would make a similar contention regarding the application of media shield law. Were a reporter to draft a memorandum to her editor regarding her thoughts, impressions or conclusions about sources used in a published article, would the Times claim that the privilege did not apply because the article already had been completed? (See *Miller v. Superior Court* (1999) 21 Cal.4th 883 [89 Cal.Rptr.2d 834, 986 P.2d 170].)

tigations, without fear of the chilling effects of disclosure upon them or their sources. (See *Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1328-1329 [283 Cal.Rptr. 893, 813 P.2d 240] ["Yet even democratic governments require some degree of confidentiality to ensure, among other things, a candid exchange of ideas and opinions among responsible officials"]; *California First Amendment Coalition v. Superior Court, supra,* 67 Cal.App.4th at p. 172 [denying CPRA petition for disclosure of applications for vacant county supervisorial position]; *Black Panther Party v. Kehoe* (1974) 42 Cal.App.3d 645, 653 [117 Cal.Rptr. 106] ["Complainants often demand anonymity. The prospect of public exposure discourages complaints and inhibits effective enforcement"].)

Candor is especially needed at the close of an unsuccessful or inconclusive investigation. A case, while promising, may not be strong enough to meet the burdens of proof beyond a reasonable doubt without additional corroborating evidence or more forthcoming witness cooperation. If anything, public policy encourages a frank and outspoken closing report unimpaired by a concern for appearances. " 'Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decisionmaking process.' " (*California First Amendment Coalition v. Superior Court, supra,* 67 Cal.App.4th at p. 172.)

Disclosure also may compromise the reopening of a case and the effectiveness of related investigations. This is particularly true with police misconduct allegations, where the involved officer may remain on the force, or be part of a like-minded clique. Police officers who step forward to aid in investigations may do so only on assurances of confidentiality; public disclosure of their statements could expose them to unjustified criticism or animosity, and cost the department their future cooperation. Public safety would be imperiled as a result of declining departmental morale, without any offsetting increase in professionalism or discipline.

Although not directly applicable, we find close parallels in the Supreme Court's decision in *Daily Journal Corp. v. Superior Court, supra,* 20 Cal.4th 1117. In *Daily Journal,* the district attorney ended the grand jury investigation of the county's bankruptcy without indicting a major investment banking firm which underwrote some of the county's debt offerings. Following media requests, the trial court ordered the release of all transcripts and documents of the closed grand jury investigation. The Supreme Court disagreed. Notwithstanding the strong public policy for openness, the high court held that the documents should not be disclosed. The Supreme Court

was concerned about the impact upon the willingness of prospective witnesses to come forward or to speak " ' "fully and frankly, as they would be open to retribution" ' " or " ' "public ridicule." ' " (*Id.* at p. 1126.)

Our conclusions make it unnecessary to consider any of the other CPRA exemptions raised by the district attorney.

## III

The Times objects to the district attorney's "self-serving" statements and asks that we not merely "take its word" regarding the contents of the nonpublic letter. But, although authorized by the CPRA (§ 6259), the Times never asked the trial court to conduct an in camera review to determine whether the nonpublic letter has been improperly withheld. Accordingly, we consider the Woodsmall and Baytieh declarations to sufficiently establish that the letter actually relates to the investigation and falls within the investigation exemption contained in section 6254, subdivision (f). No remand is necessary to further consider this issue.[6]

## IV

We reject the Times' contention that the district attorney waived the investigation exemption by providing the nonpublic letter to the Huntington Beach Police Department, which initiated the criminal investigation and employed Officer Kennedy. The district attorney did so with the understanding that the document would remain confidential. Nothing in the record indicates that this understanding has been breached.

Under the CPRA, particular exemptions may be waived only where the agency has disclosed a document "to any member of the public." (§ 6254.5.) Section 6254.5, subdivision (e) expressly provides that exemptions are not waived for interagency disclosures that are made in confidence. Based on similar concerns about the efficacy of interagency information sharing, we decided in *Michael P. v. Superior Court* (2001) 92 Cal.App.4th 1036, 1048 [113 Cal.Rptr.2d 11], that a local police department did not waive the official information privilege by divulging privileged information to a county social services agency " 'with an official interest in the information.' "

---

[6]The Times itself objected to the district attorney's belated offer in conjunction with this writ proceeding for an in camera review of the subject document because "[t]he Times' responses to the asserted exemptions stand as a matter of law, and cannot be defeated by the unnecessary and unwarranted additional delay that would flow from an *in camera* review at this late stage in the proceedings."

Let a peremptory writ of mandate issue directing respondent court to vacate its judgment of May 14, 2002, and its subsequent award of attorney fees to real party in interest, and to enter a new and different order denying real party in interest's petition for writ of mandate. The alternative writ is discharged. Petitioner is entitled to costs in this proceeding.

Sills, P. J., and Fybel, J., concurred.