[S.F. No. 24207. Sept. 27, 1982.]

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA, INC., Plaintiff and Respondent, v. GEORGE DEUKMEJIAN, as Attorney General, etc., et al., Defendants and Appellants.

COUNSEL

George Deukmejian, Attorney General, Richard D. Martland and
Anthony L. Dicce, Deputy Attorneys General, for Defendants and
Appellants.

Edwin L. Miller, Jr., District Attorney (San Diego), Peter C. Lehman and Henry R. Mann, Deputy District Attorneys, as Amici Curiae on behalf of Defendants and Appellants.

Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz and Brent A. Barnhart for Plaintiff and Respondent.

OPINION

**BROUSSARD, J.**—Pursuant to the California Public Records Act (Gov. Code, § 6250 et seq. hereafter the Act),[1] petitioner American Civil Liberties Union Foundation of Northern California, Inc. (ACLU) sought to inspect and copy, among other things, certain index cards and computer printouts held by defendant California Department of Justice. The department refused to allow inspection on the ground that the information in question was "intelligence information" exempt from disclosure under section 6254, subdivision (f) of the Act. The ACLU then brought suit to compel production of these records. The trial court, after inspecting the records *in camera*, ruled that data on the cards and printouts should be disclosed with the exception of personal identifiers and information which might reveal confidential sources. Defendants appeal from that decision.

The first issue presented by this appeal is the definition and scope of the exemption for "intelligence information" in section 6254, subdivision (f). We agree with the trial court that this exemption should not be read so broadly as to preclude discovery of any information in intelligence files which relates in some manner to criminal activity. We believe, however, that the court erred in limiting the statutory protection to personal identifiers and material which might disclose confidential sources. The term "intelligence information," even if read narrowly so as to further the Act's objective of expanded public disclosure, should protect information furnished in confidence, even if that information does not reveal the identity of a confidential source. Thus the "intelligence information" exemption severely limits the information subject to disclosure, but does not entirely protect the index cards and printouts.

---

[1] Unless otherwise indicated, all statutory references are to the Government Code.

Secondly, defendants invoke the balancing test of section 6255, asserting that the burden of segregating exempt and nonexempt information outweighs the benefits of disclosure. The issue is close, but after *in camera* inspection of the index cards in question, we conclude that in this case the segregation of personal identifiers, confidential information, and information which might reveal confidential sources will be so burdensome, and will so reduce the utility of disclosing the documents to the ACLU, that the public interest will not be served by requiring disclosure of the index cards. We therefore reverse the trial court's judgment to the extent it compels disclosure of nonexempt information on the cards in question. The computer printouts, on the other hand, contain neither confidential information nor information supplied by confidential sources, but only data derived from public records. Excision of personal identifiers from the printouts would be a relatively simple task. We therefore affirm the portion of the trial court's judgment requiring disclosure of nonexempt information on the printouts.

## I.

This case arose when the ACLU, in May of 1976, filed a request under the Act to inspect and copy a number of documents relating to state law enforcement surveillance practices and records. Among those documents were index cards compiled by a network of law enforcement departments known as the Law Enforcement Intelligence Unit (LEIU), listing persons suspected of being involved in organized crime. Each card lists, among other data, the individual's name, alias, occupation, family members, vehicles, associates, arrests, modus operandi, and physical traits. The subject of a card may be a person suspected of a specific crime; a person suspected of aiding, directly or indirectly, those involved in organized crime; or a person who is "associated" with a principal suspect. "Associates" might be individuals entirely innocent of crime, including family members, business associates, or attorneys of the principal suspects.[2]

The ACLU also sought to inspect and copy computer printouts from the Interstate Organized Crime Index (IOCI). The IOCI printouts, in contrast to the LEIU index cards, contain entries based solely on infor-

---

[2]The ACLU cites a striking example of the potential for abuse in unmonitored gathering of information by law enforcement agencies. Briefly, former State Senator Nate Holden was listed as one of six "associates" of Black Panther Party member Michael Zinzun on the latter's index card. That card was disclosed in litigation in Chicago and was, therefore, on file in other places outside California. Holden, who had never been arrested or convicted of a crime, had rented a house to Zinzun for about four months.

mation that is a matter of public record.[3] Existing IOCI printouts are still being used by law enforcement agencies but no new information is being added to them. The printout entries include, among other information, an individual subject's name, physical characteristics, criminal record, crime-related and noncrime-related associates, occupation, and residence.

The ACLU's objective in seeking disclosure was to determine generally the nature of the information contained on the LEIU cards and stored in the IOCI computers, not to ascertain the entries relating to any particular person. The ACLU, therefore, requested the first 100 cards in alphabetical order in the LEIU index and the first 100 entries in the computer printouts, omitting personal identifiers protected from disclosure by section 6254, subdivision (c).[4] When the department refused to permit inspection, the ACLU, charging that the department had violated the Act, brought suit to compel disclosure.

At trial, the department claimed the records in question were protected by section 6254, subdivision (f) of the Act, which permits the state to withhold "[r]ecords of complaints to or investigations conducted by, or records of *intelligence information* or security procedures of, the office of the Attorney General and the Department of Justice, and any state or local police agency, or any such investigatory or security files compiled by any other state or local police agency ... for correctional, law enforcement or licensing purposes ...." (Italics added.) The department also claimed an exemption under section 6255, which permits an agency to avoid disclosure of materials by showing that "on the facts of the particular case the public interest served by not making the rec-

---

[3]The department's Organized Crime Criminal Intelligence Branch is the coordinating agency not only for the LEIU which produces the index cards, but also for the nationwide computer system which formerly produced the printouts. That system, the IOCI, was originally funded by a grant from the Law Enforcement Assistance Administration (now defunct); one condition of that grant was that the computer entries be based on information that was a matter of public record.

[4]The ACLU's original request included a total of nine items; in addition to the cards and printouts, the ACLU sought disclosure of annual reports submitted to the Legislature by the department's Organized Crime Criminal Intelligence Branch (OCCIB), notes and texts of briefings given to the Legislature, a catalog of OCCIB publications, the OCCIB policy statement with regard to maintenance or establishment of political files, lists of training conferences, a hardware index, and the current issue of various publications. Some of these items were produced voluntarily; others were produced at the order of the trial court; others did not exist or had been discontinued. On appeal, defendants challenged the trial court's order only insofar as it applied to the index cards and printouts.

ord public clearly outweighs the public interest served by disclosure of the record."

■ ■■■ The trial court first rejected the department's claim of exemption under section 6254, holding that the exemptions in that section were confined to (1) personal identifiers,[5] i.e., information which might reveal the names of those who were the subjects of the cards and printouts, and (2) information which might reveal the names of confidential sources who gave the department the card and printout data. The trial court further found that "[p]ublic revelation of the information other than personal identifiers and confidential sources ... is in the public interest and the public interest weighs in favor of disclosure. Revelation of this information will inform interested members of the public of the type of information which the defendants develop and gather." Although the trial court initially concluded that separation of exempt from nonexempt information on the LEIU cards and the IOCI printouts would be unduly burdensome, on motion to modify the judgment the court reversed its decision and found that the burden of segregating nonexempt information was outweighed by the public interest in access to that information. The trial court therefore rejected the claimed exemption under section 6255,[6] and accordingly entered judgment requiring disclosure, among other matters, of the LEIU index cards and the IOCI printouts, excluding personal identifiers and data which would reveal confidential sources.

---

[5]The ACLU, as we have noted, expressly excluded from its disclosure request "personal identifiers such as names of subjects [protected] by Government Code § 6254(c)." This section exempts "personnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy." Since subdivision (c) is confined to "personnel, medical, or similar files," the personal identifiers in the cards and printouts here at issue would not be exempt under that section. We read a similar exemption for personal identifiers into the "intelligence information" exemption in subdivision (f).

A recent decision of the United States Supreme Court (*United States* v. *Washington Post Co.* (1982) 456 U.S. 595 [72 L.Ed.2d 358, 102 S.Ct. 1957] ruled that language in the federal Freedom of Information Act (5 U.S.C. § 552(b)(6)), identical to that of section 6254, subdivision (c), bars disclosure whenever release of information would constitute a clearly unwarranted invasion of privacy, regardless of the nature of the "file" in which the information is stored. Under this interpretation, section 6254, subdivision (c) would bar disclosure of personal identifiers in the cards and printouts.

[6]Section 6254, subdivision (k), exempts from disclosure "[r]ecords the disclosure of which is exempted or prohibited pursuant to provisions of federal or state law, including, but not limited to, provisions of the Evidence Code relating to privilege." This section thus incorporates the privilege for "official information" of Evidence Code section 1040. As the trial court observed, however, section 1040 involves a balancing test similar to that required by section 6255; thus, the court's rejection of the exemption under section 6255 on the ground that the public interest weighs in favor of disclosure led

## II.

The Act, enacted in 1968, replaced a confusing mass of statutes and court decisions relating to disclosure of governmental records. (See Shaffer et al., *A Look at the California Records Act and Its Exemptions* (1974) 4 Golden Gate L.Rev. 203, 210-213.) The Act begins with a declaration of rights: "In enacting this chapter, the Legislature, mindful of the right of individuals to privacy, finds and declares that access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state." In the spirit of this declaration, judicial decisions interpreting the Act seek to balance the public right to access to information, the government's need, or lack of need, to preserve confidentiality, and the individual's right to privacy. (See *Black Panther Party* v. *Kehoe* (1974) 42 Cal.App.3d 645, 651-652 [117 Cal.Rptr. 106]; *American Federation of State, etc. Employees* v. *Regents of University of California* (1978) 80 Cal.App.3d 913, 915-916 [146 Cal.Rptr. 42].)

The Act was modeled on the 1967 federal Freedom of Information Act (81 Stat. 54), and the judicial construction and legislative history of the federal act serve to illuminate the interpretation of its California counterpart. (*See Northern Cal. Police Practices Project* v. *Craig* (1979) 90 Cal.App.3d 116, 120 [153 Cal.Rptr. 173]; *Cook* v. *Craig* (1976) 55 Cal.App.3d 773, 781 [127 Cal.Rptr. 712]; *Black Panther Party* v. *Kehoe, supra,* 42 Cal.App.3d 645, 652.) As enacted in 1967, the Freedom of Information Act exempted "investigatory records compiled for law enforcement purposes." (See former 5 U.S.C. § 552 (b)(7).)[7] The California Act, enacted in 1968, elaborated on this ex-

---

the court to reject also claims of exemption under section 6254, subdivision (k) and Evidence Code section 1040.

For discussion of the relationship between section 6254, subdivision (k) and Evidence Code section 1040, and a comparison of the balancing tests required in those sections, see Note, *The California Public Records Act: The Public's Right of Access to Governmental Information* (1976) 7 Pacific L.J. 105, 121-125.

[7]The 1967 federal act contained no express mention of "intelligence information." It did incorporate other statutory exemptions, including a statute (50 U.S.C. § 403(d)(3)) which orders the Director of the Central Intelligence Agency to protect "intelligence sources." The federal courts have construed that enactment to bar disclosure of information relating to national security which could not have been obtained without guaranteeing the confidentiality of the source. (*Sims* v. *Central Intelligence Agency* (D.C.Cir. 1980) 642 F.2d 562, 571.)

It is unlikely that the California Legislature, when it enacted an exemption for "intelligence information," had in mind protection of information and sources relating to national security. The language of section 6254, subdivision (f) suggests instead that the Legislature considered "intelligence information" a subclassification of the broader exemption for law enforcement investigatory records under the 1967 federal act.

emption, barring disclosure of "[r]ecords of complaints to or investigations conducted by, or records of intelligence information or security procedures of, the office of the Attorney General and the Department of Justice, and any state or local police agency, or any such investigatory or security files compiled by any other state or local police agency, or any such investigatory or security files compiled by any other state or local agency for correctional, law enforcement, or licensing purposes...."[8]

When a series of federal decisions held that under the 1967 law all documents in a law enforcement investigatory file were exempt,[9] Congress amended the Freedom of Information Act to narrow and clarify the exemptions from disclosure. (See *Pratt* v. *Webster* (D.C.Cir. 1982) 673 F.2d 408, 417; *Climax Molybdenum Co.* v. *N. L. R. B.* (10th Cir. 1976) 539 F.2d 63, 64; *Poss* v. *N. L. R. B.* (10th Cir. 1977) 565 F.2d 654, 657.) The act, as amended in 1974, limited the exemption to "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting

---

[8]Defendants, claiming that the "intelligence information" exemption was intended to encompass all information on the LEIU index and the IOCI printouts, rely on the fact that state budget bills antedating the Act refer to the California Department of Justice's cooperative information exchange with the FBI. These bills, however, relate not to the indexing systems involved here, but to the National Crime Information Center telecommunications system which linked existing department records with a federal computer. In any case, proof that the Legislature was aware of an information exchange system does not shed any light on whether it intended to protect all information in that system from disclosure.

[9]See *Weisberg* v. *U.S. Department of Justice* (D.C.Cir. 1973) 489 F.2d 1195 (en banc), (spectrographic analysis of the bullet that killed President Kennedy is exempt since it is part of an FBI file compiled for law enforcement purposes, and nothing else is relevant); *Aspin* v. *Department of Defense* (D.C.Cir. 1973) 491 F.2d 24 (four-volume report on the coverup of the My-Lai massacre exempt in its entirety); *Ditlow* v. *Brinegar* (D.C.Cir. 1974) 494 F.2d 1073 (letters between the National Highway Traffic Safety Administration and automobile manufacturers concerning possible safety defects protected by exemption 7, even though the only potential defendants have information); *Center for National Policy Review on Race and Urban Issues* v. *Weinberger* (D.C.Cir. 1974) 502 F.2d 370 (since future fund cutoff proceeding, while unlikely and admittedly speculative, was conceivable, HEW's title VI Civil Rights Compliance Reports concerning segregation and discrimination practices in northern public schools could be kept secret).

a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel; ..."' (5 U.S.C. § 552(b)(7).) Since the 1974 amendments were adopted to reinstate the scope of the exemption as intended in the original act (see *Climax Molybdenum Co. v. N. L. R. B., supra,* 539 F.2d 63, 64), and since the California law was modeled upon that original act, we may use the amendments to guide the construction of the California Act.

█ We therefore reject defendants' contention that the "intelligence information" exemption of section 6254, subdivision (f), exempts all information which is "reasonably related to criminal activity." Such a broad exemption would in essence resurrect the federal judicial doctrine which Congress repudiated in 1974, and which was never part of California law. █ It would undercut the California decisions which in some circumstances limit the exemption of subdivision (f) to cases involving concrete and definite enforcement prospects.[10] And most important, it would effectively exclude the law enforcement function of state and local governments from any public scrutiny under the California Act, a result inconsistent with its fundamental purpose.

█ We believe, however, that the definition adopted by the trial court is too narrow. We do not dispute its exemption of "personal identifiers"; such an exemption would be required, if not by the express terms of the Act, by the right of privacy established in article I, section

[10]In *Bristol-Meyers Company* v. *F. T. C.* (D.C.Cir. 1970) 424 F.2d 935, 939, the court limited the federal exemption in the 1967 act to cases in which the prospect of enforcement proceedings is concrete and definite. The California Court of Appeal adopted the *Bristol-Meyers* definition. (*Uribe* v. *Howie* (1971) 19 Cal.App.3d 194, 213 [96 Cal.Rptr. 493]; see *State of California* ex rel. *Division of Industrial Safety* v. *Superior Court* (1974) 43 Cal.App.3d 778, 784 [117 Cal.Rptr. 726]; *Younger* v. *Berkeley City Council* (1975) 45 Cal.App.3d 825, 833 [119 Cal.Rptr. 830].) By 1976, however, the federal courts had generally rejected the *Bristol-Meyers* holding limiting the exemption to cases with concrete enforcement possibilities. (See Note, *op. cit. supra,* 7 Pacific L.J. 105, 127-128 and cases there cited.) The most recent Supreme Court decision on section 552, subdivision (b)(7) upholds an exemption for investigatory records without considering the prospects for enforcement (*United States* v. *Washington Post Co., supra,* 456 U.S. 595.)

The *Bristol-Meyers* doctrine, as adopted in *Uribe* v. *Howie, supra,* 19 Cal.App.3d 194, nevertheless remains viable as a construction of the Act. As explained in *Younger* v. *Berkeley City Council, supra,* 45 Cal.App.3d 825, 833, however, that doctrine relates only to information which is not itself exempt from compelled disclosure, but claims exemption only as part of an investigatory file. Information independently exempt, such as "intelligence information" in the present case, is not subject to the requirement that it relate to a concrete and definite prospect of enforcement proceedings.

1 of the California Constitution. Indeed, in view of the substantial harm that could be inflicted by a public revelation that an individual was listed in an index of persons involved in organized crime, or even listed as an "associate" of someone involved in organized crime, we think the exclusion of personal identifiers must be viewed broadly. Not only names, aliases, addresses, and telephone numbers must be excluded, but also information which might lead the knowledgeable or inquisitive to infer the identity of the individual in question.

We agree also that information which might lead to the disclosure of confidential sources should be exempt from disclosure. The terms of subdivision (f), however, do not protect sources as such, but protect "intelligence information." We thus see no escape from the conclusion that information supplied in confidence is protected by the Act even if the revelation of that information will not necessarily disclose the identity of the source.

We conclude that the "intelligence information" exemption bars disclosure of information that might identify individuals mentioned in the LEIU or IOCI records, that might identify confidential sources, or that was supplied in confidence by its original source.[11]

The foregoing construction of section 6254, subdivision (f) will bring that exemption into approximate alignment with the exemption in section 552, subdivision (b)(7) of the amended federal act. We recognize, of course, that California has not enacted any amendments to the Act comparable to the 1974 federal amendments, but then the California Legislature faced no overly restrictive court decisions such as those

---

[11]We agree with the trial court that information is not "confidential" in this context unless treated as confidential by its original source. Thus, information does not become confidential because the California Department of Justice and the submitting law enforcement agency agree to treat it as such; it is confidential only if the law enforcement agency obtained it in confidence originally.

Amicus calls our attention to a definition of "confidential information" in the Information Practices Act of 1977 (Civ. Code, § 1798 et seq.). That definition includes as "confidential" all information compiled by law enforcement agencies "for the purpose of a criminal investigation of suspected criminal activities, including reports of informants and investigators, and associated with an identifiable individual." (Civ. Code, § 1798.3, subd. (a)(1).) It is not clear, however, if this definition would encompass the LEIU cards or the IOCI printouts, since those materials are not necessarily compiled for the purpose of a current investigation. In any event, Civil Code section 1798.24, subdivision (g), makes it clear that information classed as confidential under the Information Practices Act may still be disclosed pursuant to the California Act; thus, the Information Practices Act definition cannot be used to define an exemption under the California Act.

which impelled the federal amendments. As we have explained, the 1974 federal amendments were intended to restate and clarify the original purpose of the federal act, and since that purpose—public access to records except where access must be limited to protect privacy or confidentiality—corresponds to the purpose of the California Act, we believe the two statutes should receive a parallel construction.

Our interpretation of subdivision (f) also derives from the fact that the Act imposes no limits upon who may seek information or what he may do with it. In the present case the ACLU seeks information to test the operation of the LEIU index and the IOCI printouts and to determine if those police intelligence systems are being misused. In other cases, however, information may be sought for less noble purposes. Persons connected with organized crime may seek to discover what the police know, or do not know, about organized criminal activities (cf. *Federal Bureau of Investigation* v. *Abramson* (1982) 456 U.S. 615, fn. 12 [72 L.Ed.2d 376, 387, 102 S.Ct. 2054]); persons seeking to damage the reputation of another may try to discover if he is listed as an organized crime figure or as an associate of such a figure; other persons may simply try to put the state to the burden and expense of segregating exempt and nonexempt information and making the latter available to the public. In short, once information is held subject to disclosure under the Act, the courts can exercise no restraint on the use to which it may be put. (See *Black Panther Party* v. *Kehoe, supra*, 42 Cal.App.3d 645, 656.)

We note, by way of contrast to the unrestricted seeking and use of information acquired under the Act, the discovery procedures employed under Evidence Code section 1040. This section serves essentially the same purpose as the "intelligence information" exemption of section 6254, subdivision (f)—the protection of confidential information. Under section 1040, however, a court will uphold disclosure only if the public interest in disclosure outweighs the necessity for preserving confidentiality (see *Shepherd* v. *Superior Court* (1976) 17 Cal.3d 107, 124, 126 [130 Cal.Rptr. 257, 550 P.2d 161]); in making this decision the court can consider the needs and interests of the particular litigants (*id.*, at p. 126), and can in some cases impose protective orders to limit the use and dissemination of the information.

If, for example, the ACLU had sought to discover LEIU or IOCI records in a pending suit, the trial court, after ascertaining the bona fides of the request, could permit inspection under section 1040 subject

to protective limitations on use or publication of the information. Since the provisions of the Act do not "affect the rights of litigants . . . under the laws of discovery of this state" (§ 6260), the limitations on disclosure in section 6254 would not restrict discovery sought in connection with such a civil action. In bringing a request under the Act, however, the ACLU stands in no better position than any member of the public who seeks to inspect LEIU or IOCI records for whatever reason he may have (cf. *Brown* v. *Federal Bureau of Investigation* (2d Cir. 1981) 658 F.2d 71, 75), and is subject to the restrictions of section 6254.

We therefore conclude that the "intelligence information" exemption bars disclosure to the ACLU of personal identifiers, confidential sources, and confidential information relating to criminal activity. Although much of the information of the LEIU cards and the IOCI printouts is thus exempt from disclosure, the scope of the intelligence information exemption alone thus is insufficient to justify the defendants' blanket refusal of disclosure.

### III.

Defendants next argue that in the present case the burden of segregating exempt from nonexempt information is so great, and the utility of disclosing nonexempt information so minimal, that the court should invoke section 6255 to bar any disclosure.[12] That section states that an agency can justify nondisclosure by showing "that on the facts of the particular case the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record."

Section 6255 has no counterpart in the federal Freedom of Information Act, and imposes on the California courts a duty which does not burden the federal courts—the duty to weigh the benefits and costs of disclosure in each particular case. We reject the suggestion that in undertaking this task the courts should ignore any expense and inconveni-

---

[12]The briefs of the Attorney General and amicus also suggest that if the court orders disclosure of any information from the LEIU cards, this would breach the LEIU agreements and result in departments of other jurisdictions refusing to provide information to the California Department of Justice. This consequence, they suggest, is one matter to be weighed by the court in evaluating the claimed exemption under section 6255. The record on appeal, however, is entirely insufficient for us to determine the effect, if any, of ordering disclosure limited to nonconfidential information upon the future exchange of data by law enforcement units.

ence involved in segregating nonexempt from exempt information. Section 6255 speaks broadly of the "public interest," a phrase which encompasses public concern with the cost and efficiency of government. To refuse to place such items on the section 6255 scales would make it possible for any person requesting information, for any reason or for no particular reason, to impose upon a governmental agency a limitless obligation. Such a result would not be in the public interest.[13]

After careful examination of the LEIU index cards *in camera*, we conclude that in the present case the public interest predominates against disclosure of the cards. It is clear that the burden of segregating exempt from nonexempt information on the 100 cards would be substantial. The cards do not indicate which material is confidential, might reveal a confidential source, or identify the subject of the report; in many instances defendants would have to inquire from the law enforcement department supplying the information. The utility of disclosure to the ACLU, on the other hand, is questionable: the deletion of personal identifiers will make it impossible for the ACLU to learn if a particular person is improperly listed as an associate of a criminal suspect (cf. fn. 2, *ante*); the deletion of confidential information will defeat its efforts to learn if any person is listed on the basis of inaccurate or unsubstantiated rumor.

At best, disclosure of nonexempt information from the cards in question might reveal certain generalities about the records, such as the proportion of persons listed with prior criminal records, the type of criminal activity of which they are suspected, etc. Conceivably such information might help to confirm or allay suspicions concerning the operation of criminal indexing systems. When this marginal and speculative benefit is weighed against the cost and burden of segregating the exempt and nonexempt material on the cards, we conclude that on the facts of this particular case the public interest served by not making the record public clearly outweighs the public interest served by disclosure

---

[13]We agree as a general principle with the language in *Northern Cal. Police Practices Project* v. *Craig* (1979) 90 Cal.App.3d 116, 124 [153 Cal.Rptr. 173], that "where nonexempt materials are not inextricably intertwined with exempt materials and are otherwise reasonably segregable therefrom, segregation is required to serve the objective of the [Act] to make public records available for public inspection and copying unless a particular statute makes them exempt." The burden of segregating exempt from nonexempt materials, however, remains one of the considerations which the court can take into account in determining whether the public interest favors disclosure under section 6255.

of the record.[14] We therefore conclude that defendants, relying on section 6255 of the Act, may refuse to disclose the subject index cards of the LEIU.

The IOCI printouts, however, stand on a different footing. All information on the printouts is derived from public records. Information so acquired is not confidential, and the public records in question are not confidential sources. Consequently, the task of segregating exempt material on the printouts reduces to one of excising the personal identifiers. This is a much less onerous burden than the deletion of personal identifiers, confidential information, and confidential sources from the LEIU cards. Weighing the burden of segregation against the benefit of disclosure of the IOCI printouts, the balance tips in favor of disclosure.

The portion of the judgment of the superior court requiring disclosure of the Interstate Organized Crime Index printouts is affirmed. The portion of that judgment requiring disclosure of the Law Enforcement Intelligence Unit index cards is reversed. The cause is remanded to the superior court for further proceedings consistent with this opinion. Each side shall bear its own costs on appeal.[15]

Mosk, J., Newman, J., and Kaus, J., concurred.

**RICHARDSON, J.,** Concurring and Dissenting.—I concur in the majority opinion to the extent that it reverses that portion of the judgment below which required disclosure of the Law Enforcement Intelligence Unit index cards. I respectfully dissent, however, from the opinion insofar as it affirms the compelled disclosure of the Interstate Organized Crime Index printouts. In my view, both the index cards and the printouts are "intelligence information" which are absolutely exempt from disclosure under state law.

---

[14]Section 6255 requires the courts to look to "the facts of the particular case" in balancing the benefits and burdens of disclosure under the Act. Thus our decision against requiring disclosure is necessarily limited to the facts of this particular case; in another case, with different facts, the balance might tip in favor of disclosure of nonexempt information on the LEIU cards. If, for example, a person were to seek disclosure of only his own card, the diminished need to delete personal identifiers (the person in question presumably knows his own identity and that of his associates) and the reduced burden of determining confidentiality of sources or information when only a single card is involved might justify a court in requiring disclosure.

[15]Plaintiff seeks attorney fees pursuant to Government Code section 6259. The trial court should determine the fees to be awarded, taking into account not only the matters litigated on this appeal, but also the other items included in plaintiff's complaint (see fn. 4, *ante*).

Unlike the federal Freedom of Information Act (81 Stat. 54) and its broadly *qualified* exemption for various investigatory records (see *ante*, p. 448), the California Public Records Act (§ 6250 et seq. of the Gov. Code, to which all statutory references relate) on its face contains an *absolute* exemption for "records of intelligence information" of all state and local law enforcement agencies. (*Id.*, § 6254, subd. (f).)

The computer printouts at issue here clearly constitute "records of intelligence information" within the meaning of the California act. As the majority explains, these printouts disclose the names, criminal records, physical characteristics, associates, occupations and residences of each person suspected of organized crime activities. Although the printouts are compiled from information contained in various public records, the printouts themselves are used exclusively by law enforcement agencies to assist in their investigations. The majority holds that only the "personal identifiers" contained in the printouts are exempt from disclosure, and it imposes upon the agency the task of excising such personal identifiers from the remaining, discoverable information.

The California act, however, does not call for, or authorize, the disclosure or segregation of the nonconfidential or nonpersonal portion of the intelligence records of law enforcement agencies. Instead, by its terms the act protects the records in toto. On the assumption that plaintiff ACLU is interested merely in the "types of information" gathered by law enforcement agencies, no reason appears why a *blank* form of printout would not suffice. As Justice Paras carefully explained in his opinion for the Court of Appeal in this case, "The [blank] forms, which defendants have not refused to provide, fully describe the 'type of information' involved. Anything more than that is the information itself, which would add nothing but specific data relating to specific people .... But the specific data placed into the blank spaces is beyond question 'intelligence information,' expressly excluded by section 6254, subdivision (f), from the scope of section 6253, subdivision (a)."

Agreeing with the foregoing reasoning, I would reverse the judgment in its entirety.

**BIRD, C. J.,** Concurring and Dissenting.—I respectfully dissent from that portion of the court's decision which denies disclosure of the LEIU cards.

James Madison once said, "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." (Letter to W. T. Barry, Aug. 4, 1822, 9 The Writings of James Madison (Hunt ed. 1910) p. 103, quoted in *EPA* v. *Mink* (1973) 410 U.S. 73, 110-111 [35 L.Ed.2d 119, 145, 93 S.Ct. 827] (dis. opn. of Douglas, J.).)

Like James Madison, the California Legislature is of the view that "access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state." (Gov. Code, § 6250.)[1] Thus, the California Public Records Act (or Act) was passed for the precise purpose of "increasing freedom of information" by giving the public "access to information in possession of public agencies." (See *Los Angeles Police Dept.* v. *Superior Court* (1977) 65 Cal.App.3d 661, 668 [135 Cal.Rptr. 575].) The Act is "intended to be construed liberally in order to further the goal of maximum disclosure in the conduct of governmental operations." (Final Rep., Assem. Statewide Info. Policy Com. [hereafter *Final Report*] (Mar. 1970) p. 145, appen. G, setting forth opn. Cal. Atty. Gen. No. 67/144 (1970).)

In approving the government's efforts in the present case to keep the LEIU cards wholly secret, today's majority concludes that (1) the cards contain much information that is exempt from disclosure under section 6254, subdivision (f); (2) segregation of the exempt material from the nonexempt would be a substantial burden on the government; and (3) this administrative inconvenience justifies withholding even the nonexempt portions of the LEIU cards, pursuant to section 6255.

The first two of these conclusions find no support whatsoever in the record. The government has never sought to demonstrate how much, if any, of the information on the LEIU cards is exempt from disclosure nor what the inconvenience or cost of deleting this information might be. Although the Public Records Act clearly places the burden of justifying nondisclosure on the agency desiring secrecy,[2] a majority of this court somehow waives this requirement and finds in favor of the government on these issues.

---

[1]All statutory references hereafter are to the Government Code, unless specified otherwise.

[2]"*The agency shall justify* withholding any record *by demonstrating* that the record in question is exempt under express provisions of this chapter or that on the facts of the particular case the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record." (§ 6255, italics added; see also *Final Report, supra*, p. 12; *EPA* v. *Mink, supra*, 410 U.S. at p. 93 [35 L.Ed.2d at p. 135].)

The court's third conclusion—that administrative inconvenience is dispositive of these plaintiffs' claim of access to the records of their government—threatens the very foundations of the Act. It represents a major triumph for bureaucratic inertia and secrecy, and it permits—and even encourages—state agencies to undermine the broad disclosure policies of the Act. Yet, as the Court of Appeal has held, the Public Records Act is "suffused with indications of a contrary legislative intent." (*Northern Cal. Police Practices Project* v. *Craig* (1979) 90 Cal. App.3d 116, 123 [153 Cal.Rptr. 173].)

The federal Freedom of Information Act (or FOIA)[3] provides a right of public access to records of federal agencies, and, as today's majority agrees, the state and federal enactments "should receive a parallel construction." (*Ante*, at p. 451.) However, the majority chooses to ignore the unanimous interpretation of the FOIA that "equitable considerations of the costs, in time and money, of making records available for examination do not supply an excuse for non-production." (See, e.g., *Sears* v. *Gottschalk* (4th Cir. 1974) 502 F.2d 122, 126, and cases cited.)

I remain unpersuaded.

## I.

The California Public Records Act was enacted against a "background of legislative impatience with secrecy in government . . . ." (53 Ops.Cal.Atty.Gen. 136, 143 (1970).) The Legislature had long been attempting to "formulate a workable means of minimizing secrecy in government." (*Id.*, at p. 140, fn. omitted.) The basic law "was vague and had been interpreted by the courts in a restrictive fashion." (*Final Report, supra*, p. 7.)

Moreover, it "appeared . . . to be creating (or perhaps merely reinforcing) an attitude of reluctance on the part of various administrative officials to make records in their custody available for public inspection." (53 Ops.Cal.Atty.Gen., *supra*, p. 143.) Those limited reform efforts that managed to become law—such as the Brown Act of 1953[4]—were insufficient to address the problems. What was needed was a comprehensive statute governing access to information. (Schaffer et al., *A Look at the California Records Act and Its Exemptions* (1974) 4 Golden Gate L.Rev. 203, 212.)

[3] 5 United States Code section 552.
[4] Statutes 1953, chapter 1588, page 3269.

Such an enactment was the California Public Records Act. (§§ 6250-6265.) The tone of the Act was set by the broad language used to define "public records." (§ 6252, subd. (d).) "This definition is intended to cover every conceivable kind of record that is involved in the governmental process and will pertain to any new form of record-keeping instrument as it is developed." (*Final Report, supra*, p. 9.)

Like the federal Freedom of Information Act upon which it was modeled, "the general policy of the [Public Records Act] favors disclosure. Support for a refusal to disclose information 'must be found, if at all, among the specific exceptions to the general policy that are enumerated in the Act.'" (*Cook v. Craig* (1976) 55 Cal.App.3d 773, 781 [127 Cal.Rptr. 712], citation omitted, quoting *State of California* ex rel. *Division of Industrial Safety* v. *Superior Court* (1974) 43 Cal.App.3d 778, 783 [117 Cal.Rptr. 726].) The burden of establishing that an exception applies lies with the agency resisting disclosure. (See *ante*, fn. 2.)

Even where the Public Records Act permits nondisclosure, it does not *require* withholding the requested information. (*Black Panther Party* v. *Kehoe* (1974) 42 Cal.App.3d 645, 656 [117 Cal.Rptr. 106].) The Act sets forth "the minimum standards" for access to government information, and generally "a state or local agency may adopt requirements for itself which allow greater access to records." (§ 6253.1; see also *Final Report, supra*, p. 9.)

Moreover, the fact that parts of a requested document fall within the terms of an exemption does not justify withholding the entire document. (*Northern Cal. Police Practices Project* v. *Craig, supra*, 90 Cal.App.3d at p. 123.) Section 6257 of the Act specifically provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt by law."

Relying on the Public Records Act, plaintiff ACLU has sought to examine a random sampling of the LEIU cards[5] maintained by the

---

[5]The ACLU agrees that all information on the LEIU cards which identifies an individual should be deleted prior to disclosure.

The ACLU also sought a similarly edited sampling of entries in the now-defunct IOCI system. Since I agree with the majority that this information should be released to plaintiff, I do not discuss that aspect of the case further.

California Department of Justice (or Department) ostensibly in connection with its function of "[g]athering, analyzing and storing intelligence pertaining to organized crime." (§ 15025, subd. (a).) The ACLU's concern stems from mid-1970's revelations on the national level of law enforcement abuses in the acquisition and maintenance of information for surveillance purposes. The fears expressed at that time have increased as a result of the Department's recent publication of a report purportedly relating to organized crime and terrorism. (Rep.Cal.Atty. Gen. (May 1981) Organized Crime in Cal.—1980, pt. 2, Terrorism.) The report suggests that the Department views its duty to monitor organized crime activities as covering "activities of domestic extremist groups in the form of rallies and demonstrations." (*Id.*, p. 1.)

Thus, the goals of the ACLU suit include testing the degree to which units in the Department of Justice engage in political surveillance under the guise of obtaining information pertaining to law enforcement and "determining whether the conduct of [the Department] complies with law . . . ."

The Department has refused to disclose any portion of the LEIU cards. It asserts that two provisions of the Public Records Act authorize its actions. Primary reliance is placed on subdivision (f) of section 6254 (Exemption (f)), which permits the withholding of "records of intelligence information . . . of . . . the office of the Attorney General and the Department of Justice, and any state or local police agency . . . ." The Department also seeks to invoke the provision of section 6255 authorizing nondisclosure when "on the facts of the particular case the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record."

Throughout these proceedings, the Department has taken the position that these exemptions protect the LEIU cards in toto. It has adduced no evidence to establish a confidential source for any specific information on any of the cards. Moreover, while occasionally asserting that segregation of exempt from nonexempt information would be "burdensome," the Department has offered no testimony, affidavit, or other evidence of the extent of this alleged burden.

Following meticulously conducted proceedings *in camera*—including examination of the LEIU cards themselves—the trial court ruled in fa-

vor of disclosure except for "those portions [of the cards] which show and disclose personal identifiers and confidential sources." It found that disclosure of the nonexempt material "will inform interested members of the public of the type of information which the [Department] develop[s] and gather[s]." It further found the public interest served by disclosure to be "the need to insure that [the Department is] complying with the Constitution and laws of the United States and the State of California . . . and to defend and protect constitutional rights by guarding against unlawful invasions of privacy and personal security by over-zealous spying, surveillance and covert activities."

I agree with the majority that the trial court's interpretation of the Public Records Act's exemption for "records of intelligence information" was too narrow. Exemption (f) permits withholding not only information which might identify confidential sources but also "confidential information furnished only by the confidential source" to "a criminal law enforcement authority in the course of a criminal investigation." (See 5 U.S.C. § 552 (b)(7)(D) [hereafter Exemption 7(D) of the FOIA].)

This conclusion is supported by a close reading of Exemption (f). By the plain wording of the Public Records Act, the Legislature sought to protect confidential "information," not merely the identity of confidential sources. Moreover, in providing within the same subdivision for disclosure of certain facts to victims or their representatives, the Legislature specifically exempted the "statements" and "names and addresses" of confidential informants. This indicates that the Legislature was aware of a distinction between statements and identity and that its choice of the broad term "intelligence information" was intended to encompass more than either of these two ideas separately.

Reading Exemption (f) as protecting confidential sources and information brings this portion of the California Act into close alignment with Exemption 7(D) of the FOIA. (See, e.g., *Duffin v. Carlson* (D.C. Cir. 1980) 636 F.2d 709, 712.) I agree that the two exemptions should normally receive a "parallel construction." (Maj. opn., *ante*, at p. 451.)

However, I am perplexed by one reason tendered by the majority for interpreting Exemption (f) in this fashion. Here, it is asserted that the Public Records Act should be interpreted in light of the "fact" that "information may be sought for less noble purposes" than those of the ACLU in this case. (*Ante*, p. 451.) This reasoning is completely untenable.

The majority conjures up the possibility that a disclosure request may be made for ignoble purposes and yet fails even to consider that bureaucracies may have improper reasons of their own for refusing disclosure.

Secrecy is not required by the Public Records Act; disclosure is virtually always permitted. (§ 6253.1.) Thus, it is well recognized that disclosure may be resisted not because of a genuine need for secrecy, but out of fear of "arous[ing] public opinion against the policies the agency is determined to employ." (See Schaffer et al., *supra*, 4 Golden Gate L.Rev. at p. 209.) A governmental agency may resist disclosure merely because "from a bureaucratic standpoint, a general policy of revelation could cause positive harm, since it could bring to light information detrimental to the agency and set a precedent for future demands for disclosure." (*Vaughn* v. *Rosen* (D.C.Cir. 1973) 484, 820, 826.) In entirely ignoring these obvious teachings of history, the majority blinds itself to the very need for a Public Records Act in the first place.

Moreover, the majority thwarts one of the Legislature's avowed purposes in passing the Act, i.e., to "invalidate[]" court decisions which had interpreted the prior law "in a restrictive fashion." (*Final Report, supra*, p. 7.)

In an Attorney General's opinion incorporated into the *Final Report*, it was said to be "clear" that the Act "is intended to be construed liberally in order to further the goal of maximum disclosure in the conduct of governmental operations." (53 Ops.Cal.Atty.Gen., *supra*, at p. 143; *Final Report, supra*, at p. 145.) This source also indicated that the "same historical evidence which compels the conclusion that the . . . Act should be construed broadly also compels the conclusion that [the exemptions] must be construed strictly so as not to interfere with the basic policy of the act." (53 Ops.Cal.Atty.Gen., *supra*, p. 143; *Final Report, supra*, at p. 145.)

The federal cases interpreting the FOIA are all in agreement with our Legislature and our Attorney General. The federal courts have universally accepted the proposition that the FOIA "creates a liberal disclosure requirement, limited only by specific exemptions which are to be narrowly construed." (*Bristol-Myers Company* v. *F. T. C.* (D.C.Cir. 1970) 424 F.2d 935, 938, fn. omitted, cert. den., 400 U.S. 824 [24 L.Ed.2d 52, 91 S.Ct. 46]; see also *Dept. of Air Force* v. *Rose* (1976) 425 U.S. 352, 361, 366 [48 L.Ed.2d 11, 21, 24, 96 S.Ct. 1592]; *Vaughn* v. *Rosen, supra*, 484 F.2d 820, 823, cert. den., 415 U.S. 977

[39 L.Ed.2d 873, 94 S.Ct. 1564].) This, of course, ·is the very same Freedom of Information Act whose "judicial construction and legislative history ... serve to illuminate the interpretation of its California counterpart." (Maj. opn., *ante*, at p. 447.)

While I agree with the majority as to the scope of Exemption (f), I cannot subscribe to the dictum which would construe the disclosure provisions of the Act in a one-sided manner, blind to the countervailing considerations. Such statutory construction might accord with those justices' view of good policy, but it does not conform to that which is supposed to be paramount—the Legislature's intent.

## II.

Having determined the proper scope of Exemption (f), the majority proceeds to uphold the Department's claim of secrecy under the balancing test of section 6255. (See *ante*, fn. 2.) It rules that the cost and administrative inconvenience of segregating exempt from nonexempt information on the LEIU cards justify the refusal to disclose any information contained in these public records. This conclusion is absurd. It violates the terms and basic concerns of the Public Records Act, the prior court decisions of this state, the "parallel" Freedom of Information Act and the cases interpreting it, as well as common sense.

It is inconceivable that the Legislature, in enacting the section 6255 balancing test, intended to permit administrative cost and inconvenience to be dispositive of a request for access to public records. Nowhere in section 6255 or the Act as a whole is such an intention manifested.

The specific exemptions of section 6254 are of considerable aid in ascertaining the Legislature's conception of "the public interest served by not making [a] record public ...." as used in section 6255.[6] However, none of these provisions displays a solicitude for the inconvenience or cost to bureaucracies of affording access to public records. The concerns articulated relate to protection of personal privacy, confidential information, and agency deliberative processes, not bureaucratic convenience.

Further evidence in this regard can be found in the final sentence of section 6257. There, it is required that "[*a*]*ny* reasonably segregable

---

[6]See Note, *The California Public Records Act: The Public's Right of Access to Governmental Information* (1976) 7 Pacific L.J. 105, 119.

portion of a record *shall be provided* ... after deletion of the portions which are exempt by law." (Italics added.) It is difficult to see how the Legislature could have been clearer in requiring the production of *any* such nonexempt material.[7]

The Legislature clearly was aware that some requests for information under the Public Records Act would require an agency to (1) "search for and collect ... records from ... establishments that are separate from the office processing the request"; (2) "search for, collect, and appropriately examine a voluminous amount of separate and distinct records"; and (3) consult with "another agency ... or among two or more components of the agency." (See § 6256.1.) The only concession granted to a bureaucracy by the Legislature in this regard was that such "unusual circumstances" would permit the agency a maximum of 10 extra working days within which to respond to the request. (*Ibid.*) There is not the slightest suggestion that such circumstances ipso facto justify a refusal to disclose.

If any further evidence of legislative intent is necessary, it can be found in section 6250, where the Legislature "declares that access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state." Today's majority attributes to the Legislature an intent to permit this "fundamental and necessary right" to be overcome by a mere allegation of bureaucratic inconvenience and cost. Once again, this is patently absurd.

In addition to these direct indications of legislative intent, simple logic and experience dictate that the public's right to know not be overridden by claims of bureaucratic inconvenience. The history of freedom of information laws, both in this state and on a national level, is largely

---

[7]The majority opinion hints in a footnote that nonexempt information is not "reasonably segregable" if the burden of segregation is great. (*Ante*, fn. 13, p. 453.) This suggestion does not withstand analysis.

The "reasonably segregable" provision of the California Act was lifted nearly verbatim from the federal Freedom of Information Act. (Cf., final sentence of 5 U.S.C. § 552(b).) The federal provision, in turn, has been interpreted to require disclosure of any nonexempt material "if it is at all intelligible—unintelligibility indicating, of course, that it is not·'reasonably' segregable from the balance." (U.S. Dept. Justice, Atty. Gen. Memo. on 1974 Amends. to Freedom of Information Act (Feb. 1975), in Sourcebook: Legislative History, etc., Freedom of Information Act and Amendments of 1974 (94th Cong., 1st Sess., 1975) pp. 524-525.)

As will be shown hereafter, the federal cases have uniformly rejected the position of the majority that administrative burden can be dispositive of a disclosure request under the FOIA.

the history of bureaucratic resistance to revealing agency operations. If a disclosure request may be defeated by an agency's showings of administrative cost and burden, then the very foundations of the Public Records Act are undermined.

Initially, uncertainty is injected by this court into an act where clarity was intended. The result will surely be that agencies will be emboldened to resist disclosure requests. This is contrary to the Legislature's intent. Compliance was to be encouraged. The likely result of today's decision is the multiplication of contested court proceedings and the end of voluntary settlements.

Even more important, the bureaucracy—rather than the Legislature, the courts, or the people—will be empowered to determine what records will be revealed. It is the bureaucracy that decides in what form and where to keep its records. By commingling exempt and nonexempt information and spreading out responsibility for the compilation and storage of records, the agency can be assured of a tenable claim of exemption under section 6255. At the very least, already wary agencies are discouraged from creating "internal procedures that will assure that disclosable information can be easily separated from that which is exempt." (See *Vaughn v. Rosen, supra*, 484 F.2d at p. 828; see also *Irons v. Gottschalk* (D.C.Cir. 1976) 548 F.2d 992, 996, cert. den., 434 U.S. 965 [54 L.Ed.2d 451, 98 S.Ct. 505].)

Finally, as modern society becomes more complex, so do the issues which confront us and the agencies that are supposed to serve us. At the same time, our demands and expectations of government continue to expand. Thus, colorable claims of administrative burden will increase. As a result, constrained by this court's holding that access to public records may be denied because of bureaucratic burdens, the Public Records Act will be reduced to an anachronism, applicable to trivialities or events no longer important, but incapable of ensuring the public knowledge necessary to the proper functioning of a democracy.

It is, therefore, not surprising that the courts have unanimously taken a position contrary to that of today's majority. "Undoubtedly, the requirement of segregation casts a tangible burden on governmental agencies and on the judiciary. Nothing less will suffice, however, if the underlying legislative policy of the [Act] favoring disclosure is to be implemented faithfully. If the burden becomes too onerous, relief must be

sought from the Legislature." (*Northern Cal. Police Practices Project* v. *Craig, supra*, 90 Cal.App.3d at p. 124.)

The federal cases are in complete accord. "[E]quitable considerations of the costs, in time and money, of making records available for examination do not supply an excuse for non-production." (*Sears* v. *Gottschalk, supra*, 502 F.2d at p. 126.) "Allowing such a defense would undercut the Act's broad policy of disclosure." (*Ferguson* v. *Kelly* (N.D.Ill. 1978) 455 F.Supp. 324, 326.) Even a cursory sampling of cases involving the Freedom of Information Act reveals that the federal act is used to obtain access to enormous quantities of documents from which an agency must segregate exempt information. The request in the present case for access to 100 small LEIU cards pales by comparison. (See, e.g., *Pratt* v. *Webster* (D.C.Cir. 1982) 673 F.2d 408 [FOIA used to obtain access to edited versions of over 1,000 documents, totalling thousands of pages]; *Reporters Committee for Freedom of the Press* v. *Sampson* (D.C.Cir. 1978) 591 F.2d 944, 949, fn. 17 [FOIA available to obtain access to the "massive volume of materials" in the presidential papers of former President Nixon]; *Diapulse Corp. of Am.* v. *Food & D. Admin. of Dept. of H.E.W.* (2d Cir. 1974) 500 F.2d 75 [FOIA used to obtain access to thousands of documents, the collection and editing of which would take four to six days].)

These federal practices and cases should be highly persuasive to those members of this court who have signed today's majority opinion. Their opinion is replete with statements acknowledging that the Public Records Act "was modeled upon" the federal act and "should receive a parallel construction." (See, e.g., *ante*, at pp. 449, 451.) Yet, federal authority is conspicuously absent when they decree that bureaucratic inconvenience may prevail over the people's "fundamental and necessary right" to know.

I am constrained once again to disagree.

### III.

Even if the administrative burden to an agency could be dispositive of a request for information under the Act, I would be hard pressed to comprehend the conclusion of the majority that as a matter of law, the LEIU cards are exempt from disclosure. The majority reasons that (1) "much of the information of the LEIU cards . . . is . . . exempt from disclosure"; (2) the "burden of segregating exempt from nonexempt in-

formation on the 100 cards would be substantial"; and (3) on balance "the public interest predominates against requiring disclosure" of the nonexempt information. (Maj. opn., *ante*, at pp. 451-453.) The first two of these conclusions are wholly unsupported by the record; the third is a serious misapplication of the law.

The Department has never even attempted to establish how much, if any, of the information on the LEIU cards is exempt from disclosure under a proper interpretation of Exemption (f). Rather, it has consistently taken the position that all of the information on those cards per se constitutes "records of intelligence information." Since this court has correctly rejected this extreme position (*ante*, at pp. 449-450), I am at a loss to discover the source of its conclusion that "much of the information of the LEIU cards" is exempt under a proper interpretation of Exemption (f). Indeed, the only evidence on this point suggests there is little "intelligence information." A high ranking Justice Department official testified in passing that, "L.E.I.U. is just an index anyway .... *It does not have hard intelligence.* L.E.I.U. does not contain that."[8] (Italics added.)

There are similar problems with the court's conclusion regarding the "substantial" burden of segregation. Here, at least, the Department has proffered an allegation that segregation is "burdensome," but its claim is conclusory and supported by *no* facts. "[B]are conclusory allegations [do] not suffice to establish an essential fact concerning the applicability of an FOIA exemption." (*Irons* v. *Bell* (1st Cir. 1979) 596 F.2d 468, 471.) Agency claims that an exemption applies "may or may not be accurate." (*Vaughn* v. *Rosen, supra*, 484 F.2d at p. 824.) Thus, "courts will simply no longer accept conclusory and generalized allegations of exemptions ...." (*Id.*, at p. 826, fn. omitted.)

It is the court, not the agency, which finally determines the applicability of an exemption. (See § 6259; *Black Panther Party* v. *Kehoe, supra*, 42 Cal.App.3d at p. 657; see also, e.g., *Lame* v. *United States Dept. of Justice* (3d Cir. 1981) 654 F.2d 917, 922.) Without evidence, however, a court obviously cannot make that determination. Neither this court nor the trial court has been presented with such evidence.

Given this state of the record and the fact that the agency bears the burden of establishing the applicability of an exemption (see *ante*, fn.

---

[8]The bulk of this official's testimony, like that of the other witnesses below, involved merely the authentication of documents to be examined by the court.

2), it is hard to fault the trial court for ordering disclosure. How this court manages to arrive at a contrary conclusion as a matter of law remains a mystery.

It bears noting that the interpretation given today to Exemption (f) was not the interpretation used at the trial proceedings below. Moreover, the Department, relying on its erroneous reading of Exemption (f), tendered no evidence as to how much information on the LEIU cards would disclose or is attributable to a confidential source, as this court today construes those terms. The proper disposition of this aspect of the appeal would be to remand the case for further proceedings in light of the interpretation today given Exemption (f) and section 6255.

One final point. The section 6255 balancing test permits the withholding of records only when "the public interest served by not making the record public *clearly* outweighs the public interest served by disclosure of the record." (§ 6255, italics added.) The word "clearly" is significant. The Assembly Information Policy Committee itself emphasized the word in its *Final Report*: "A public agency may only refuse to disclose the contents . . . of a public record, if it can . . . show that the public interest *clearly* is on the side of non-disclosure . . . ." (*Final Report, supra*, p. 12; accord 53 Ops. Cal.Atty.Gen., *supra*, at p. 148.)

In light of this heavy burden on those who seek to justify nondisclosure, the majority's conclusion that the public interest predominates against disclosure is even more indefensible. It represents no more than lip service to the test of section 6255. It seems to present yet another example of the roughshod manner in which the majority ride over the commands of the Legislature and the "fundamental and necessary right of every person in this state" to information about his or her government. (See § 6250.)

Respondent's petition for a rehearing was denied November 15, 1982, and the opinion was modified to read as printed above. Newman, J., and Reynoso, J., did not participate therein. Bird, C. J., was of the opinion that the petition should be granted.